# In the United States Court of Federal Claims

No. 15-1572C
(Filed: December 22, 2016)

| | |
|---|---|
| GLENN-COLUSA IRRIGATION DISTRICT, et al.,      ) ) ) ) | |
| Plaintiffs,      ) ) | Subject matter jurisdiction; Flood Control Act of 1970; divestment of Tucker Act jurisdiction |
| v.      ) ) | |
| THE UNITED STATES,      ) ) | |
| Defendant.      ) ) | |

*Stuart L. Somach*, Sacramento, CA, for Plaintiff. *Michael A. Gheleta*, *Francis M. Goldsberry, II*, and *Alexis K. Stevens*, Sacramento, CA, of counsel.

*Jeffrey M. Lowry*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Benjamin C.* Mizer, Acting Assistant Attorney General, *Robert E. Kirschamn, Jr.*, Director, and *Steven J. Gillingham*, Assistant Director, for defendant.

## O P I N I O N

**FIRESTONE**, *Senior Judge*.

Plaintiff, Glenn-Colusa Irrigation District ("GCID"), brought this action on December 23, 2015 invoking this court's jurisdiction under the Tucker Act, 28 U.S.C. 1491(a)(1) and seeking damages from the United States for an alleged breach of a cost-sharing agreement between GCID and the United States Army Corps of Engineers ("Corps").  Under the terms of the cost-sharing agreement, the Corps, "subject to receiving funds appropriated by the Congress of the United States . . . and using those

funds and funds provided by [GCID]" agreed to construct the Riverbed Gradient Facility Project for the Sacramento River at the GCID intake. Mot. to Dismiss at A4.  GCID claims that the Corps violated the cost-sharing agreement by failing to properly build the riverbed gradient facility.

The government has filed a motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") in which it argues that the court lacks jurisdiction over the dispute based on Section 221 of the Flood Control Act of 1970, 42 U.S.C. § 1962d-5b(c).  Section 221 states as follows: "Enforcement; jurisdiction. Every agreement entered into pursuant to this section shall be enforceable in the appropriate district court of the United States."  The government argues that Section 221 vests an appropriate district court with exclusive jurisdiction over GCID's breach of contract claim and therefore the case before this court must be dismissed.

The government's motion is fully briefed and oral argument was held on December 20, 2016.  For the reasons discussed below, the motion to dismiss is **GRANTED**.

## I.    BACKGROUND

The following facts are taken from GCID's complaint and for purposes of this motion are not disputed.  GCID is an irrigation district diverting water from the Sacramento River pursuant to water rights perfected under California law prior to 1900. Compl. ¶ 3.  As a result of litigation concerning impacts on winter-run salmon from GCID irrigation diversions, GCID and federal and state agencies agreed to jointly develop a long-term solution to address both protection of fishery resources and ensuring

a reliable water supply for GCID.  *Id.* ¶¶ 11-14.  The solution was a Fish Screen Project consisting of two essential components: (1) a fish screen extension (fish screen) and (2) a Riverbed Gradient Facility for the Sacramento River at the GCID irrigation diversion intake (Gradient Facility).  *Id.* ¶ 16.

The fish screen was authorized by Congress, built by the United States Bureau of Reclamation, and was turned over to GCID, which assumed ownership and responsibility for its operation, maintenance, and repair in 2011.  *Id.* ¶¶ 17-19.  The fish screen is in operation today and operates as intended.  *Id.*

Congress originally authorized the Gradient Facility in 1990.  *Id.* ¶ 20. The Gradient Facility was designed to mimic a natural riffle in the river in order to accommodate the passage of fish and boats.  *Id.* ¶ 25.  The increased water surface elevations provided by the Gradient Facility during low flows were intended to increase sweeping flows past the fish screen and to improve the overall performance of the Fish Screen Project.  *Id.*  Authorization for the Gradient Facility was modified several times, with Congress authorizing a total cost of $14,200,000 in 1996, a total cost of $20,700,000 in 1998, and finally a total cost of $26,000,000 in 1999.  *Id.* ¶¶ 21-23.

GCID entered into a Project Cooperation Agreement ("Agreement") with the Corps for the Gradient Facility in 1999.  *Id.* ¶ 28.  The Agreement set forth the responsibilities of GCID and the Corps with respect to cost sharing, construction, and operation and maintenance of the Gradient Facility.  *Id.* ¶ 34.  The Agreement provided that design and construction of the Gradient Facility would be the responsibility of the Corps and the Corps was required to "expeditiously construct the Project . . . ."  *Id.* ¶ 35.

3

GCID was responsible for contributing a minimum of 25 percent of the total project costs. *Id.* ¶ 36. Upon completion of the project, the Agreement provided that GCID would assume responsibility for the operation, maintenance, repair, replacement, and rehabilitation of the project. *Id.* ¶ 42.

The Agreement included a provision dealing with potential damages from faulty construction. It required GCID to indemnify the Corps from "all damages arising from the construction, operation, maintenance, repair, replacement, and rehabilitation of the Project and any Project-related betterments, *except for damages due to the fault or negligence of the Government or its contractors*." *Id.* ¶ 45 (emphasis added). The Agreement also included a dispute resolution provision. Mot. to Dismiss at A14.

GCID alleges that almost immediately after construction was completed in 2000, defects associated with the Gradient Facility were observed. *Id.* ¶ 52-53. The Corps convened a team of experts, known as the "Gradient Facility Blue Ribbon Panel," in August 2008, to assess the design of the Gradient Facility and recommend correction of any deficiencies. Both prior to and following release of the Blue Ribbon Panel Report, GCID alleges that it repeatedly tried to get the Corps to address the Gradient Facility's defects. *Id.* ¶¶ 74-85. GCID alleges the defects were not addressed but that on March 22, 2013 the Corps notified GCID that construction of the Gradient Facility was "complete" and transferred responsibility for the Gradient Facility to GCID. *Id.* ¶ 86.

GCID alleges that the Gradient Facility has degraded as a result of the Corps' failure to address its design and construction deficiencies. GCID contends that it has incurred, and will continue to incur, substantial costs because of the Corps alleged failure

to fulfill its contractual obligations. *Id.* ¶¶ 91-93.  GCID claims that by failing to address the design and construction defects associated with the Gradient Facility, the Corps has breached its contractual duties to GCID.  GCID further alleges that its attempt to resolve the dispute under the dispute resolution provision of the Agreement has failed and thus its breach of contract claims are ripe for adjudication.

GCID filed the present action on December 23, 2015 and the government filed its motion to dismiss on April 7, 2016, arguing that this court lacks jurisdiction over the dispute.  Briefing on the government's motion is complete and oral argument was heard on December 20, 2016.  The matter is now ripe for disposition.

## II.   DISCUSSION

### A.   Standard of Review

This case comes before the court on the government's motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1).  "In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014) (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993)).  However, a party invoking this court's jurisdiction ultimately "has the burden of establishing jurisdiction by a preponderance of the evidence." *Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015) (citing *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013); *Reynolds v. Army & Air Force Exch. Serv*., 846 F.2d 746, 748 (Fed. Cir. 1988)).  If a motion to dismiss for lack of jurisdiction challenges the

jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the complaint in order to determine whether it has jurisdiction. *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (citing *Reynolds*, 846 F.2d at 747).

**B.     Under Section 221 of the Flood Control Act Only the "Appropriate Federal District Court" Has Jurisdiction to Hear Disputes Concerning Cooperative Agreements**

As noted, GCID premises this court's jurisdiction on the Tucker Act averring that the cooperative agreement it entered into with the Corps is a contract which the Corps breached by failing to properly construct the Gradient Facility.  The Tucker Act grants this court "jurisdiction to render judgment upon any claim against the United States founded upon . . . any express . . . or implied contract . . . ." 28 U.S.C. § 1491(a)(1).  The Tucker Act waiver of sovereign immunity is not absolute, however, and can be displaced or modified by statute or treaty.  *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 175 (2005).  The government argues that Section 221 of the Flood Control Act is an example of a statute that has displaced the Tucker Act and has placed jurisdiction over contract disputes involving cooperative agreements authorized by the Flood Control Act in the "appropriate district court."  42 U.S.C. § 1962d-5b.  The government argues in the alternative that the Flood Control Act does not allow for money damages in the event of a breach of a cooperative agreement and thus the cooperative agreement does not create a money-mandating claim against the United States.

GCID argues in response that the 1970 Flood Control Act did not displace the Tucker Act.  GCID also argues that the cooperative agreement is money-mandating.  Specifically, GCID argues that the Corps agreed in the cooperative agreement that it

could be liable for damages "due to the fault or negligence of the Government or its contractors." Compl. ¶ 45.

The court finds for the reasons that follow that Section 221 of the 1970 Flood Control Act did displace the Tucker Act for disputes involving cooperative agreements and GCID's action in this court must be dismissed.  It is thus not necessary to decide whether GCID may seek money damages pursuant to the cooperative agreement.

It is well-settled that the United States, "as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941); accord *Furash & Co. v. United States*, 46 Fed. Cl. 518, 520 (2000), aff'd 252 F.3d 1336 (Fed. Cir. 2001).  The Court of Federal Claims does not possess jurisdiction over claims against the Government unless Congress consents to a particular cause of action.  *United States v. Testan*, 424 U.S. 392, 399 (1976).  Congress does not consent to suit in this Court under the Tucker Act "when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." *United States v. Bormes*, 133 S. Ct. 12, 18 (2012). The Supreme Court has explained that the purpose of the Tucker Act was to provide a judicial avenue for monetary claims against the United States that did not previously exist.  *Id.*  Thus the Supreme Court has held that where statues provide their own specific judicial remedies, those remedies replace the more general remedies of the Tucker Act. *Id.*; *see also Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2063 (2013).

The Supreme Court has further held that to determine whether another statutory scheme has displaced this court's Tucker Act jurisdiction requires an examination into "the purpose of the [statute], the entirety of its text, and the structure of review that it

establishes." *Horne*, 133 S. Ct. at 2062-63 (*citing United States v. Fausto,* 484 U.S. 439, 444 (1988)).  Following such an examination the Supreme Court in *Bormes* determined that the Little Tucker Act, which provides a limited waiver of sovereign immunity for money claims in federal district courts, similar to the waiver for greater sums in this court under the Tucker Act, was displaced by the remedial scheme established in the Fair Credit Reporting Act.  In *Bormes* the plaintiff sought to recover damages for allegedly improper disclosure of his credit card information by a federal court filing fee system. 133 S. Ct. at 15.  The plaintiff argued that the government had waived its sovereign immunity for violations of the Fair Credit Reporting Act under the Little Tucker Act.  *Id.* After the United States District Court dismissed Mr. Bormes's claim on the grounds that the Little Tucker Act did not apply and that the Fair Credit Reporting Act did not waive the Government's sovereign immunity, the plaintiff appealed to the Federal Circuit.  *Id.* at 15-16.  On appeal, the Federal Circuit held that the Little Tucker Act served to waive the government's sovereign immunity and that the Fair Credit Reporting Act was a money-mandating statute permitting recovery from the government.  *See Bormes v. United States*, 626 F.3d 574, 580 (Fed. Cir. 2010).

The Supreme Court reversed the decision of the Federal Circuit holding that the Tucker Act had been displaced by the specific statutory scheme Congress created in the Fair Credit Reporting Act.  *Bormes*, 133 S. Ct. at 13.  The Court explained that the Tucker Act was meant to provide an avenue for monetary relief for claimants against the government that was previously foreclosed by sovereign immunity.  *See id.* at 17-18. Thus, the Court held that when Congress creates a statue with its own avenues for judicial

action, the Tucker Act's broad waiver of sovereign immunity is replaced by the statues'
specific waiver.  *Id.* at 18-19.  With regard to the Fair Credit Reporting Act, a unanimous
Supreme Court concluded that by placing jurisdiction over violations in the "appropriate
United States district court without regard to the amount in controversy, or in any other
court of competent jurisdiction," Congress meant to displace the Tucker Act as a remedy.
*Id.* at 19 (quoting 15 U.S.C. § 1681p).

     The Supreme Court reached a similar conclusion in *Horne v. Department of
Agriculture,* 133 S. Ct. 2053 (2013).  In *Horne,* California raisin growers sought to raise a
Fifth Amendment takings claim as a defense to the Department of Agriculture's
allegations that they had failed to retain raisins in reserve and pay assessments as required
by the Agricultural Marketing Agreement Act of 1937 ("AMAA").  *Id.* at 2056.  On
appeal the United States Court of Appeals for the Ninth Circuit held that the raisin
growers were required to raise their takings claims in the Court of Federal Claims.  *Id.*
The Supreme Court reversed, holding that the AMAA contained its own remedial scheme
and vested jurisdiction over any disputes with the district courts.  *Id.* at 2063.  The
AMAA stated that the federal district court was "vested with jurisdiction" to review an
agency decision.  *Id.* (quoting 7 U.S.C. § 608c 15(B)).  Applying the test noted above, the
Court held that the AMAA displaced the Tucker Act and thus raisin growers were
required to take their claim to the appropriate district court, not the Court of Federal
Claims.  *See id.* ("We thus conclude that the AMAA withdraws Tucker Act jurisdiction
over petitioners' takings claim.  Petitioners (as handlers) have no alternative remedy"
other than filing in district court).

In this case, as in *Horne*, an examination of "the purpose of the [statute], the entirety of its text, and the structure of review that it establishes," *id.* at 2062-63, demonstrates that the Flood Control Act has displaced the Tucker Act and that Congress has vested the appropriate district court with jurisdiction over GCID's breach of contract claim.  The Project Cooperation Agreement at issue in this case was entered into under the authority of the Flood Control Act. Section 221 of the Act, as codified at 42 U.S.C. § 1962d-5b, describes the general requirements for a written water resource project partnership agreement.  In addition to detailing these requirements, as noted, the section also contains a subsection entitled "Enforcement; jurisdiction." 42 U.S.C. § 1962d-5b(c). The "Enforcement; jurisdiction" subsection provides that: "Every agreement entered into pursuant to this section shall be enforceable in the appropriate district court of the United States." *Id.*  Thus, the Flood Control Act, like the statues at issue in *Bormes* and *Horne*, provides a specific avenue of relief in place of the more general jurisdictional grant of the Tucker Act and vests the "appropriate district court" with jurisdiction over agreement disputes.

Plaintiff's reliance on *California v. United States*, 271 F.3d 1377 (Fed. Cir. 2001) to suggest that the Federal Circuit has expressly determined that the Flood Control Act has not repealed the Tucker Act is unfounded.  *California* concerned 33 U.S.C. § 702c, which provided that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods . . . ." *Id.* at 1380-81.  The Federal Circuit concluded that the broad immunity provisions in that section did not implicitly repeal the Tucker Act.  *Id.* at 1383.  This case, of course, deals with Section 221 of the 1970 Flood Control

Act which is not an immunity provision, but an express grant of power to the district courts to enforce agreements pursuant to the Act. 42 U.S.C. § 1962d-5b(c).

GCID's reliance on this court's decision in *King v. United States*, 112 Fed. Cl. 396, 400 (2013) to suggest that this court may still have jurisdiction over plaintiff's contract dispute is also unfounded. The issue in *King* was whether the Fair Labor Standards Act which permits suit in "any Federal or State court of competent jurisdiction," includes this court. Because the court concluded that the Court of Federal Claims was a "court of competent jurisdiction" it denied the government's motion to dismiss. The statute at issue in *King* is substantively different from the Flood Control Act. Section 221 of the Flood Control Act expressly places jurisdiction in "the appropriate district court," which is far more narrow language than provided by the Fair Labor Standards Act. The Flood Control Act thus requires that agreements made pursuant to 42 U.S.C. § 1962d-5b(c) be enforced only in federal district courts, which the Court of Federal Claims is not.

Plaintiff further contends that the Flood Control Act, read together with the Tucker Act, combines to allow a party two avenues of recovery. Pl.'s Response at 14 ("Under the 1970 Flood Control Act, a party may proceed in the district court seeking the equitable remedy of enforcement of an agreement executed under authority of that act, while under the Tucker Act, that same party could proceed in the Court of Federal Claims and seek a legal remedy of damages for breach of contract."). In essence, Plaintiff avers that the Flood Control Act limits the appropriate district court to only provide equitable relief, while any party seeking money damages would have to come to the Court of Federal

11

Claims.  There is no reason to believe that the district courts are limited in the remedies they may provide a plaintiff in any action brought pursuant to the Flood Control Act. Nothing in 42 U.S.C. § 1962d-5b(c) can be fairly interpreted as reducing federal district courts to mere courts of equity when faced with a breach of a contract under the Flood Control Act.

Plaintiff finally argues that the Flood Control Act does not expressly repeal Tucker Act jurisdiction. Specifically, Plaintiff notes that "Congress could have said that jurisdiction was 'solely' or 'exclusively' in the district court, but it did not use any such express language." Pl.'s Response at 12. Such specific language, however, is not required in order to divest the Court of Federal Claims of jurisdiction when a statute has specifically granted jurisdiction to the district courts.  For example, in *Horne*, discussed *supra*, the relevant statute was 7 U.S.C.S. § 608c 15(B), which stated that "The District Courts of the United States (including the Supreme Court of the District of Columbia [District Court of the United States for the District of Columbia]) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling. . . ."  That statute never used the words "solely" or "exclusively" when stating that the district courts were vested with jurisdiction to hear AMAA matters.  Nevertheless, the Supreme Court held that that language was sufficient enough to withdraw Tucker Act jurisdiction over petitioners' claims. *Horne*, 133 S. Ct. at 2063.

The same conclusion must be reached here.  The 1970 Flood Control Act states that "[e]very agreement entered into pursuant to this section shall be enforceable in the

appropriate district court of the United States." 42 U.S.C. § 1962d-5b(c).  That language is just as specific as the language noted in *Horne*.  Accordingly, the court must find that the intention of the of the Flood Control Act was to allow for disputes in agreements to be adjudicated by the appropriate federal district court, thereby divesting the Court of Federal Claims of Tucker Act jurisdiction.

## III.    CONCLUSION

For the foregoing reasons, this court does not have jurisdiction over GCID's breach of contract case.  The government's motion to dismiss for lack of subject matter jurisdiction is **GRANTED**.  The complaint shall be dismissed without prejudice.  The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge